UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

————————————————————————

MONTELL EMERSON,
                                        Plaintiff,

        vs.                                              9:08-CV-824
                                                         (NAM/ATB)

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, ET AL.,
                                        Defendants.

————————————————————————

MONTELL EMERSON, Plaintiff *pro se*
CHARLES J. QUACKENBUSH, Ass't Att'y Gen., for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred for Report and Recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Norman A.

Mordue, Chief United States District Judge.

        Plaintiff filed a civil rights action relating to events that occurred while he was

in the custody of the Department of Correctional Services ("DOCS")[1] at the Walsh

Regional Medical Unit ("RMU") in the Mohawk Correctional Facility ("Mohawk").

        Plaintiff's Amended Complaint ("AC") (Dkt. No. 85) alleges that twelve DOCS

employees violated plaintiff's Eighth Amendment rights by their deliberate

indifference to his serious medical needs and/or cruel and unusual conditions of his

---

[1] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

confinement.  (AC ¶¶ 30-48, 50).[2]  Plaintiff also alleges that DOCS violated the

Americans with Disabilities Act ("ADA")[3] and section 504 of the Rehabilitation Act

("section 504")[4] by failing to accommodate his disabilities so that he could participate

in outdoor exercise.  (AC ¶¶ 51(a)-(d), 52-55, 58, 62-65).[5]  Finally, plaintiff claims

that three additional DOCS employees violated his First Amendment rights by

retaliating against him for filing the instant lawsuit, by initiating unfounded

disciplinary charges.  (AC ¶¶ 59-60).  Plaintiff seeks monetary damages and

declaratory relief under 42 U.S.C. § 1983, the ADA, and Section 504.  (AC ¶ 78).

Presently before this court is the defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56 (Dkt. No. 107), and voluminous supporting medical

records and other documentation (Dkt. Nos. 108-124).  After being granted several

adjournments and receiving requested assistance in securing declarations from certain

DOCS employees (*see* Dkt. Nos. 125-130 and related docket entries), plaintiff filed a

voluminous response in opposition to the motion, supported by more than 600 pages

of exhibits.  (Dkt. No. 133).  Plaintiff also filed two letters explaining why his

responsive brief exceeded the court's page limit and his responsive papers were a few

---

[2] Paragraph 49 of the Amended Complaint was stricken, by order of this court dated October 4, 2010 (Dkt. No. 84 at 3-4, 11-13), pursuant to the September 29, 2009 decision of Chief Judge Mordue (Dkt. No. 49), granting in part and denying in part defendants' earlier motion (Dkt. No. 36) to dismiss the original complaint (Dkt. No. 1).

[3] 42 U.S.C. § 12101, *et seq.*

[4] 29 U.S.C. § 794.

[5] The ADA and section 504 allegations in paragraphs 51(e), 51(f), 56, and 57 of the amended complaint were stricken, by order of this court dated December 15, 2010, pursuant to the prior decision of Chief Judge Mordue.  (Dkt. No. 98 at 2 n.1, 5).

days late.  (Dkt. Nos. 134, 135).  Because both sides referenced what transpired at three disciplinary hearings involving plaintiff, without attaching the corresponding transcripts, the court, on August 24, 2011, directed defense counsel to supplement the record with the transcripts of those hearings.  (Dkt. Nos. 137-1, 138-1, 140-1).  The court has reviewed and considered all of the submissions from the plaintiff and the defendants.  For the following reasons, this court recommends that defendants' motion be granted, and that all of the remaining allegations of, and defendants named in, the amended complaint be dismissed.

## DISCUSSION

## I.   **Factual Background**[6]

In March 2004, prior to his incarceration by DOCS, plaintiff suffered severe injuries from multiple gunshot wounds.  (Medical Records ("MR") at 1061, 1101).[7] When plaintiff arrived at RMU, in May 2006, he was a paraplegic who used a wheelchair for mobility.  (AC ¶ 4).  He suffered from impairments to mobility in his right arm, skin ulcerations (decubitis), nerve and bone damage, and trauma to various organs.  Due to injuries to his nervous system, plaintiff had to expel feces through a colostomy device and urine through a catheter.  (Burdick Decl. ¶ 4, Dkt. No. 107-13; MR 2, 17-18, 1114; AC ¶¶ 26-27).

---

[6] Defendants' Memorandum of Law fairly summarizes the earlier procedural history of this action.  (Dkt. No. 107-1 at 3-4).  The facts relating to each of plaintiff's causes of action are discussed in greater detail below, as those claims are addressed.

[7] Defendants have consecutively numbered the plaintiff's voluminous medical records, which are filed at Dkt. Nos. 108-122.  The court will refer to medical records by these "Bates" numbers, which appear in the lower right-hand corner of each page.

Defendant Robert Burdick, M.D., was plaintiff's primary care physician at RMU from May 2006 until mid-December 2007, when defendant Michael Salvana, M.D., assumed that role.  (Burdick Decl. ¶ 5; Salvana Decl. ¶ 3, Dkt. No. 107-16). The doctors' declarations and 2600 pages of supporting medical records document that the plaintiff received continuous medical attention and care from the RMU staff during the time period covered by the amended complaint.  Throughout each day, the medical staff monitored plaintiff's daily activities and took his vital signs, re-dressed plaintiff's wounds, attended to his colostomy bags and his hygiene, and administered medication.  (*See, e.g.*, MR 368-525 (Progress Notes, 5/06-11/06); MR 1487-1517, 1551-1567 (Care Plans); MR 1518-1550 (Pressure Ulcer Staging Forms); MR 1572-1716 (vital signs Graphic Charts); MR 1751-1789 (Activities of Daily Living ("ADL") forms); MR 1813-2281 (Medication Records)).  Plaintiff had access to occupational therapy (*see, e.g.*, MR 1791-1812), whirlpool therapy (*see, e.g.*, MR 1751-1771), physical and recreational therapy (*see, e.g.*, MR 89, 2283-2315), nutritional services and special diets (*see, e.g.*, MR 347-367), and a wound care clinic (*see, e.g.*, MR 65, 441, 443-445, 447, 457).  He had frequent laboratory and other medical tests (*see, e.g.*, MR 1226-1481), was often referred to medical specialists of various kinds, and was periodically transferred to hospitals for needed surgery and other treatment (*see, e.g.*, MR 1006-1225 (hospital records and Request and Report of Consultation forms)).

According to the RMU staff, plaintiff was a belligerent, abusive, and uncooperative patient who frequently subjected the medical staff to vulgar,

disrespectful language and resistant, sometimes threatening behavior.  (*See, e.g.*,

Burdick Decl. ¶¶ 5, 7; 12/12/07 Inmate Misbehavior Report, Dkt. No. 123 (verbal

"assault" and threatening body language and facial expressions); Salvana Decl. ¶¶ 3,

24; MR 21 (ranting and raving using foul language), 83 (aggressive behavior and

yelling obscenities), 127-128 (used vulgar language and acted out by pulling

emergency alarm), 183 (tirade declaring nurse a "fucking bitch"), 444-446 (plaintiff

verbally threatened doctor and swung out of bed on trapeze mechanism, causing

doctor to fear he would be assaulted), 1190 (referral of plaintiff for mental health

evaluation)).  During the time period relevant to the complaint, plaintiff frequently

hindered his own care, by refusing treatment, declining medication, ignoring medical

advice and direction, and failing to cooperate with the staff.  (*See, e.g.*, Burdick Decl.

¶¶ 14-15; Salvana Decl. ¶¶ 18-20; MR 187-191, 193-201, 347-353, 374-377, 385, 387,

389, 774, 776, 779, 784 (various incidents of refusing medication, failure to cooperate

with sterile dressing changes, and/or refusals to maintain proper diet); MR 466-467

(plaintiff generally has minimal participation in occupational therapy and spends the

majority of his time socializing); 1089 (refusal to participate in surgical consult); MR

1722, 1724, 1730, 1732, 1734, 1736, 1738, 1740, 1746, 1748, 1756, 1764, 1776,

1774, 1776, 1778, 1780, 1784, 1786  (various refusals of whirlpool therapy, showers,

and/or meals); MR 2291, 2306 (refusal of physical therapy); MR 2316-2453 (Refusal

of Medical Examination and/or Treatment forms); MR 2514 (non-compliant with

consults and clinical efforts at wound management).  The DOCS physicians stated that

plaintiff's failure to care for himself, as directed, and his obstruction of treatment

contributed to the deterioration of some of plaintiff's medical conditions, particularly his pressure ulcers, and made him more vulnerable to, *inter alia*, infections.  (Salvana Decl. ¶¶ 18-20; Burdick Decl. ¶¶ 14-15).

While at RMU, plaintiff filed numerous grievances and complaints claiming deficiencies in his medical care and alleging that DOCS failed to accommodate his disabilities in various ways.  (Pl.'s Stmt. of Mat. Facts at 10-19, Dkt. No. 133-1; Pl.'s Mem. of Law at 8-18, Dkt. No. 133; Dkt. Nos. 124-1, 124-2, 124-4, 124-5, 124-7, 124-8, 124-9).  On November 27, 2007, plaintiff was moved to the E-wing of Mohawk as a result of disciplinary charges.  (AC ¶ 42; MR 807).[8]  This transfer led to further complaints that plaintiff's cell in the disciplinary wing was too cold, and that the whirlpool in E-wing was defective and unsafe.  (Dkt. Nos. 124-3, 124-6).  Plaintiff filed the instant lawsuit in July 2008.  (Dkt. No. 1).  In November 2009 and December 2009, additional disciplinary charges were filed against plaintiff, which he claims were the result of retaliation for filing this action.  (Dkt. Nos. 124-10, 124-11).

## II.    Summary of Contentions

The Amended Complaint alleges that, between June 2006 and October 2007, Drs. Burdick and Salvana and five other DOCS employees, acting with deliberate indifference to plaintiff's serious medical needs, deprived him of adequate pain medication.[9]  (AC ¶¶ 31-36).  Plaintiff further alleges that various defendants violated

---

[8] Plaintiff's constitutional claims regarding the discipline imposed as a result of these charges have been dismissed and stricken.  (Dkt. No. 49 at 27, 31; Dkt. No. 84 at 3-4, 11-13).

[9] Defendants' Memorandum of Law lists, in greater detail, the factual allegations of the Amended Complaint against particular defendants.  (Dkt. No. 107-1 at 5-6).

his Eighth Amendment rights by (1) depriving him of the "Roho" board, which provided extra support on his wheelchair, between late November 2007 and February 2008 (AC ¶¶ 37-41); (2) allowing plaintiff to use only the "obsolete" whirlpool on the E-wing of RMU, after he was transferred to that wing in November 2007 for disciplinary reasons (AC ¶¶ 46-48); and (3) depriving him of a "Clinitron" bed at RMU, and providing him with an inferior air mattress (AC ¶ 50).  The Amended Complaint also claims that plaintiff's Eighth Amendment rights were violated when he was subjected to cruel and unusual conditions of confinement, specifically an unreasonably cold cell, while he was confined in E-wing during the winter of 2007-2008.  (AC ¶¶ 42-45).

Plaintiff further alleges that DOCS discriminated against him based on his disabilities by not timely providing accommodations that he required to participate in outdoor exercise during the winter months.  The surviving claims under the ADA and section 504 arise from DOCS' alleged failure to keep the outdoor exercise area clear of snow and ice, and delays in supplying plaintiff with his own personal winter parka, gloves, and long underwear.  (AC ¶¶ 51(a)-(d), 52-55, 58, 62-65).

Finally, plaintiff claims that three defendants violated his First Amendment rights by retaliating against him for filing the instant lawsuit.  He alleges that two unfounded disciplinary charges were filed against him on November 19, 2010 and December 26, **2010**, although, as discussed elsewhere herein, those charges appear to have been filed in late **2009**.  (AC ¶¶ 59-60).

The defendants argue that the plaintiff's disagreement with the treatment

decisions of the medical staff does not support his claim of deliberate indifference, particularly in light of the ongoing medical care provided to him and plaintiff's chronic failure to cooperate with treatment.  (Def.s' Mem. of Law at 10-16, 18-20). The defense contends that plaintiff was not subjected to conditions of confinement that violated the Eighth Amendment, and that no defendant acted with deliberate indifference to the temperature in his cell.  (*Id.* at 17-18).

With respect to plaintiff's ADA and section 504 claims, the defendants argue that no reasonable juror would conclude that DOCS deliberately denied plaintiff any accommodation that precluded him from participating in appropriate exercise programs.  (*Id.* at 20-22).  Defendants contend that there is no genuine dispute that the two disciplinary charges at issue were appropriately filed, and that, even if the defendants involved had a retaliatory motive (which they all deny), plaintiff would have been disciplined in any event.  (*Id.* at 22-25).  Finally, defendants argue that many of the named defendants were not personally involved to the extent necessary to support section 1983 claims against them, and/or that they are entitled to qualified immunity.  (*Id.* at 10, 26-28).

## III.   <u>Summary Judgment–Legal Standards</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56[10];

---

[10] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

*Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56 (c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48.

"[I]n a pro se case, the court must view the submissions by a more lenient

9

standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (a court is to read a *pro se* party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

## IV.   Eighth Amendment–Medical Care

### A.   Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b)

10

'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185.  The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain.  *Bellotto v. County of Orange*, 248 F. App'x at 236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose  of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference.  *Id*. at 835, 837.  The defendant must be subjectively aware that his or her conduct creates

11

the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (table).

## B.    Application

This court will address, in turn, the several ways in which plaintiff claims that the defendants provided him with constitutionally inadequate medical care–denying him, for various periods of time, sufficient pain medication, the support board for his

wheel chair, an adequate whirlpool, and a Clinitron bed.  However, in deciding whether the defendants were deliberately indifferent with respect to these specific treatment issues, the court  must consider the broader context of the extensive and continuing care that the DOCS medical staff provided to plaintiff, as described in section I, above.  *See, e.g., Estelle v. Gamble*, 429 U.S. at 107 (considering the overall extent and scope of medical care provided to inmate plaintiff in determining that his claim that "more should have been done by way of diagnosis and treatment" may have indicated medical malpractice, but failed to state an Eighth Amendment cause of action).  Plaintiff's disagreement with particular medical decisions made by the defendants and his conclusory allegations of deliberate indifference do not negate the extensive evidence that Drs. Burdick and Salvana, as well as the other defendants, reasonably and diligently addressed plaintiff's medical needs over an extended period of time.  Further, plaintiff's frequent refusal of prescribed medication and recommended treatment, and his chronic non-compliance with the directions of the medical staff further undermines his claims of deliberate indifference on the part of the DOCS medical staff.  *See, e.g., Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his back issues).[11]

---

[11] *See also Brown v. Selwin*, 250 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) (finding no deliberate indifference when it was "uncontroverted that [plaintiff] refused medical treatment on several occasions"); *Ross v. Kelly*, 784 F. Supp. at 46-47 (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment).

### 1.    Pain Medication

As the defendants concede, the plaintiff had serious pre-existing medical conditions, which could be presumed to cause him considerable pain.  (Def.'s Mem. of Law at 11).  Prior to plaintiff's arrival at RMU, his medical providers treated his pain with potent narcotic medications.  (Burdick Decl. ¶¶ 6, 16).  Plaintiff complains that, because defendant Burdick did not want to make a special order for plaintiff's pain medication, the doctor immediately substituted morphine sulfate for Oxycodone,[12] despite plaintiff's complaints that the Oxycodone had been more successful in controlling plaintiff's pain at Bellevue Hospital.  (Pl.'s Mem. of Law at 1-2; Pl.'s Stmt. of Mat. Facts at 2-3; Pl.'s Exs. 274-278).[13]  The Amended Complaint alleges that Drs. Burdick and Salvana, as well as defendant Nellenbach, a registered nurse, discontinued plaintiff's pain medication in June 2006, based on unfounded allegations that plaintiff was hoarding prescribed drugs.  (AC ¶¶ 30-32).  Plaintiff claims that, between June 16, 2006, and early October 2007, Dr. Burdick "became so fixated on making sure plaintiff didn't receive any narcotic that any form of pain relief for the

---

[12] Oxycodone and morphine are both in a class of medications called opiate (narcotic) analgesics, and are used to relieve moderate to severe pain.  *PubMed Health*, National Center for Biotechnology Information, U.S. National Library of Medicine,  www.ncbi.nlm.nih.gov. Plaintiff's medication records indicate that he was given Percocet, a combination of Oxycodone and acetaminophen, at RMU on May 28, 2006.  (MR 1823)

[13] In support of his response to the instant summary judgment motion, plaintiff submitted over 600 pages of exhibits, docketed as Nos. 133-6 through 133-33.  Many of plaintiff's exhibits duplicate exhibits submitted by the defendants.  The court will cite to the medical records as filed by the defendants, which are more complete than the selective group of medical records submitted by the plaintiff.  When citing to plaintiff's other exhibits, the court will refer to the consecutive exhibit numbers written by plaintiff on each page.

plaintiff was completely neglected." (AC ¶¶ 33, 36). Plaintiff further alleges, that after he was discharged from the hospital on various occasions in February, May, and July 2007, Dr. Burdick discontinued all pain medications ordered by the hospital doctors. (AC ¶ 34).

For the reasons set forth below, the court concludes that no reasonable jury could conclude that Drs. Burdick and Salvana acted with deliberate indifference to plaintiff's need for pain medication. Moreover, plaintiff's disagreement with the physicians' medical judgments about the appropriate medication does not support an Eighth Amendment claim. As to the other five defendants named in the Amended Complaint in connection with this claim, they lacked personal involvement sufficient to establish their liability under section 1983, but also did not act with deliberate indifference towards plaintiff.

### a.    Plaintiff's Treating Physicians

As Drs. Burdick and Salvana stated in their declarations, DOCS physicians use great care in prescribing narcotics to inmate patients because these drugs create serious, and potentially lethal, health risks to the patients, and are highly addictive. (Burdick Decl. ¶ 6; Salvana Decl. ¶ 6). Furthermore, narcotics are a dangerous form of contraband in prisons, which can be hoarded by prisoners for personal abuse or trafficking. (Burdick Decl. ¶ 6; Salvana Decl. ¶ 7). Dr. Burdick, plaintiff's first primary care physician, and others on the RMU medical staff, developed serious concerns that plaintiff was exaggerating his complaints of pain as part of an effort to illicitly obtain narcotics. (Burdick Decl. ¶¶ 8-9; Salvana Decl. ¶ 8; *see, e.g.*, MR 376,

1115-1116).[14]  On June 1, 2006 Dr. Burdick's Progress Notes reflected his observation that plaintiff "is so heavily addicted that no amount of [morphine sulfate] is going to placate him."  (MR 380).  On June 6th, Dr. Burdick noted plaintiff's complaint that morphine sulphate is "not working," and observed "he is so heavily dependent on narcs [sic] hard to say what if anything except in industrial doses will work. . . .  He does not look in pain not writhing on bed . . . ."  (MR 388).

On June 16, 2006, Sgt. Fitzpatrick (apparently now deceased) came to the medical unit and reported that plaintiff had been caught passing morphine tablets to another inmate during an "open arms" meeting.  Nurse Nellenbach advised Dr. Salvana, who discontinued plaintiff's order for morphine tabs, and ordered that the narcotic be administered in a liquid elixir form, to prevent hoarding.  (MR 405).  On June 20, 2006, Dr. Burdick was made aware of the report that plaintiff had abused his medication, but authorized staff to continue providing morphine in liquid form, as well as methadone.  (MR 406-407; Burdick Decl. ¶¶ 11-13 ).

During this time period, plaintiff periodically contaminated his skin with his own urine and feces, and increased the risk of worsening skin ulcers and infection by refusing to comply with directions to change his body position, get out of bed, bathe, and to cooperate with sterile dressing changes.  (Burdick Decl. ¶¶ 14-15; Salvana Decl. ¶¶ 10, 20; *see, e.g.*, MR 374-377, 379, 381-382 384, 389, 407).  The DOCS

---

[14] For example, plaintiff complained of pain in his lower body, although his injuries had paralyzed him, leaving him unable to experience physical sensation below the navel.  (*Id.*).  Dr. Salvana's declaration noted that, even if plaintiff did experience "phantom pain" from his lower body, as a result of his damaged nervous system, opiates such as morphine, did not appear to have a beneficial effect on such "neuropathic" pain.  (Salvana Decl. ¶ 9).

physicians concluded that stupor, due to over-medication, appeared to be a contributing factor to plaintiff's resistance to direction from, and treatment by, the medical staff.  (Burdick Decl. ¶ 16; Salvana Decl. ¶¶ 10-11).  Dr. Burdick's June 21, 2006 Progress Note stated:

> per RN sleeps all the time missing meals.  States too much pain to go to meals. If he was/is in so much pain then he wouldn't be able to sleep.  He's over narcotized . . . but I am between a rock & hard place.  Apparently at Rikers the patient was given whatever he wanted just to keep him quiet.

(MR 412-413).

Based on their medical judgment that large doses of narcotics were not clinically effective and were compromising plaintiff's care, Dr. Burdick and the RMU medical staff worked to wean plaintiff from his apparent dependence on narcotics and substitute other appropriate pain medications.  (Burdick Decl. ¶¶ 12, 17, 19; 12/12/2007 Burdick statement, Dkt. No. 123 at 3 (plaintiff's pain is neuropathic, which should not be treated with narcotics); Salvana Decl. ¶¶ 11-14).  At various times in 2006 and 2007, plaintiff's pain medications were changed or adjusted.  (*See, e.g.*, MR 380 (plaintiff willing to try methadone), 428 (morphine and methadone dosages reduced), 455-457 (narcotics discontinued after dosages were slowly tapered, not as a punishment tool, but because his pain does not require narcotics);[15] 468-469

---

[15] Plaintiff claims that Dr. Burdick withheld pain medication as a form of behavior modification. (Pl.'s Mem. of Law at 8, citing MR 447, 471; Pl.'s Stmt. of Mat. Facts at 19). There were clearly times when plaintiff did not receive treatment as a result of his failure to cooperate, *e.g.*, by signing the consent form necessary to attend the wound clinic.  (MR 447, 471).  And, the medical staff was constantly trying to motivate plaintiff to follow medical advice and cooperate with therapeutic treatment.  However, plaintiff has provided no documentary support for the suggestion that he was maliciously deprived of medically necessary medication as punishment.

(patient given Tylenol for general discomfort, which appears to provide relief), 518 (patient started on Cymbalta),[16] 746 (patient requests and receives Tylenol #3 with codeine)).  But, plaintiff's medication records establish that he consistently received a variety of medications to address his pain between June 2006 and October 2007.  (MR 1813-2084 (5/06-10/07 Medication Records)).[17]  Following hospitalization and surgery, during which he may have again received narcotic medication (*see, e.g.*, MR 1105, 1119, 1132, 1156, 1172), plaintiff was given both narcotic and non-narcotic pain medication, although the RMU physicians again tried to wean plaintiff from reliance on narcotics that left him lethargic and uncooperative with treatment. (Burdick Decl. ¶ 18; Salvana Decl. ¶ 13; MR 1940, 1945-1946, 1948, 1960, 1968, 1993, 1994, 1996, 1999, 2004, 2010, 2035, 2041-2042).[18]

---

[16] Cymbalta, a brand name for Duloxetine, is an anti-depressant that is sometimes prescribed for ongoing bone and muscle pain or fibromyalgia. *PubMed Health*, www.ncbi.nlm.nih.gov.

[17] Plaintiff's medication records reflect that he received some form of morphine and methadone through late July 2006. (*See also* MR 455-57). At various times thereafter, he was again treated with narcotic pain relievers–M.S. Contin (controlled release morphine sulfate) in February 2007, March 2007, and May 2007; methadone in August 2007; and Tylenol 3 with codeine in July 2007, September 2007, and October 2007. Between June 2006 and October 2007, plaintiff consistently received regular Tylenol and Neurotin–a brand name of Gabapentin, an anti-convulsant also used to treat neuropathic pain or fibromyalgia. *PubMed Health*, www.ncbi.nlm.nih.gov. As noted above, plaintiff was treated with Cymbalta between November 2006 and June 2007. Plaintiff also periodically received other pain relievers, including Naprosyn and Ultram–a brand name of Tramadol, and part of a class of medications called opiate agonists. *Id.* (MR 1813-2084 (5/06-10/07 Medication Records)).

[18] Plaintiff alleges that he received insufficient pain medication after returning from hospitalizations on February 26, March 21, May 5, May 10, and July 28, 2007. (AC ¶ 34; Pl.'s Mem. of Law at 5-7). The cited medication records show that plaintiff received M.S. Contin or methadone, along with other non-narcotic medications, while at RMU in the aftermath of those hospitalizations. Plaintiff claims that Dr. Burdick discontinued his narcotic medications too quickly after he returned to RMU from the hospital. (Pl.'s Stmt. of Mat. Facts at 6-9).

Plaintiff's suggestion that Dr. Burdick and the RMU staff completely failed to address his pain with medication during parts of 2006 and 2007 is contradicted by the declarations of his treating doctors, which are, in turn, corroborated by the applicable DOCS medical records.  Plaintiff's conclusory claims that he received essentially no medical help with pain control at RMU does not create an issue of fact in the face of the overwhelming documentary evidence to the contrary.  *See, e.g.*, *Benitez v. Pecenco*, 92 Civ. 7670, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White*, 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).[19]

Differences in opinions between the plaintiff and his doctors as to the appropriate pain medication clearly do not support a claim that the doctor was

---

[19] *See also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

deliberately indifferent to the inmate's "serious" medical needs.  *See, e.g., Candelaria v. Coughlin,* 93 CIV. 3212, 1994 WL 707004, at *5 (S.D.N.Y. Dec. 19, 1994) (the fact that paraplegic inmate plaintiff would have preferred stronger, controlled substances does not give rise to a constitutional violation); *Evans v. Manos*, 336 F. Supp. 2d 255, 262, 263 (W.D.N.Y. 2004) (inmate's opinion that doctor should have prescribed something stronger than Advil does not give rise to an issue of fact as to whether his constitutional rights were violated); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need).  Even if the physicians at RMU decided not to indefinitely continue narcotic medications recommended by the hospital doctors who treated plaintiff, those differences in medical judgment, informed by a longer relationship with the patient, do not establish deliberate indifference.  *See, e.g., Wright v. Genovese*, 694 F. Supp. 2d 137, 160  (N.D.N.Y. 2010) (the fact that the DOCS physician and the consulting cardiologist disagreed, at one point, whether Percocet was the appropriate medication for an inmate following heart surgery, does not support a deliberate indifference claim); *Ortiz v. Makram*, 96 Civ. 3285, 2000 WL 1876667 at *9-10 (S.D.N.Y. Dec. 21, 2000) (primary prison doctor was not deliberately indifferent to an inmate patient's serious medical needs when, after reviewing the report of a consulting urologist, he determined, in his medical judgment, to prescribe a different pain killer than Percocet, as recommended by the specialist).

 To the extent the DOCS physicians were influenced, in their decisions

20

regarding plaintiff's medication, by their belief that plaintiff was dependent on and

abusing narcotics, to his detriment, no reasonable jury would find that they acted with

deliberate indifference.[20]  *See Wright v. Genovese*, 694 F. Supp. 2d at 160-61

(N.D.N.Y. 2010) ("concern about prescribing narcotic pain medication, on which

inmates with possible substance abuse issues could become dependent, may

appropriately inform a medical judgment about what drug to prescribe") (collecting

cases).  Even if the defendant doctors wrongly concluded that the plaintiff was

engaged in drug-seeking behavior, or misjudged the nature and extent of his true

physical pain, their medical judgments regarding medication might constitute

malpractice, but would not support plaintiff's Eighth Amendment claim.[21]  *See, e.g.,*

---

[20] Plaintiff argues that the allegation that he hoarded and shared narcotics with other inmates was unfounded and never resulted in disciplinary action against him.  He cites several medical records in which Dr. Burdick refers to plaintiff as a drug hoarder/seller in connection with decisions to discontinue his narcotic pain medication.  (Pl.'s Mem. of Law at 3-4; Pl.'s Stmt. of Mat. Facts at 6-9, 11-12).  However, Drs. Burdick and Salvana did not immediately discontinue plaintiff's narcotic medication when they learned of the allegation that plaintiff improperly provided some of his medication to another inmate.  And, as discussed above, both of plaintiff's primary treating doctors pointed to other objective observations which supported their conclusions that plaintiff was engaged in unhealthy drug-seeking behavior, and that long-term narcotic pain medication was not an appropriate or effective treatment for plaintiff.

[21] According to Dr. Burdick, he was relieved as plaintiff's primary care physician in mid-December 2007 following "an extreme, potentially violent outburst directed towards the medical staff and myself."  This incident resulted in a misbehavior report against plaintiff (which apparently did not culminate in a disciplinary hearing), and grievances filed by plaintiff.  (Burdick Decl. ¶ 5; Dkt. Nos. 123, 124-12).  Plaintiff claims that Dr. Burdick falsely accused him of making various threats, and that this evidences the doctor's hostility and deliberate indifference.  (Pl.'s Mem. of Law at 7-8; Pl.'s Stmt. of Mat. Facts at 12-14).  This factual dispute is not material to the question of whether Dr. Burdick acted with deliberate indifference in connection with plaintiff's medical care.  As a result of his negative interactions with plaintiff, Dr. Burdick requested to be relieved as plaintiff's primary care physician, and Dr. Salvana thereafter assumed that role.  No reasonable jury could conclude that, by recognizing that his personal concerns regarding plaintiff made it appropriate for another doctor to take over plaintiff's primary care, Dr. Burdick demonstrated deliberate indifference to plaintiff's medical needs.

*Candelaria v. Coughlin,* 1994 WL 707004, at \*5-6 (even if the medication prescribed for paraplegic inmate did not entirely mask his pain, no reasonable fact finder could conclude that the defendant medical providers, who provided almost constant medical observation and treatment, acted with deliberate indifference); *Salahuddin v. Goord,* 467 F.3d at 280-81 (a physician who has a sincere belief that his treatment decision does not subject his patient to a substantial risk of harm or chronic and substantial pain does not act with deliberate indifference, even if his medical judgment proves to be unsound).[22]

### b.    The Other Named Defendants

Plaintiff also claims that Dr. Lester Wright, Deputy Commissioner of DOCS; Dr. Yogendra Sharma, the Facility Health Services Director ("FHSD") at Mohawk; Leo Payant, the Superintendent of Mohawk; Ann Rabideau, the Deputy Superintendent for Health; and Nurse Judith Nellenbach should also be liable, under Section 1983 and the Eighth Amendment, for alleged deprivations of plaintiff's pain medication. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability.

---

[22] Plaintiff now alleges that, in **May 2008**, defendant Burdick bribed another inmate to plant two MS Contin tablets in plaintiff's cell, which resulted in disciplinary action against plaintiff and the discontinuation of narcotic medication. In support of this claim, plaintiff submitted an affidavit which the other inmate purportedly dictated to plaintiff because the inmate could not write as a result of a prior stroke. (Pl.'s Mem. of Law at 20-21; Pl.'s Stmt. of Mat. Facts at 17; Pl.'s Exs. 345-360). Without making any judgment as to the credibility of plaintiff's claim, to which defendants have not had the opportunity to respond, the purported facts are not material to any issue relating to the claim in this case that defendant Burdick acted with deliberate indifference to plaintiff's serious medical needs **between June 2006 and October 2007**.

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). The Amended Complaint makes no factual allegation regarding the involvement of defendant Wright in plaintiff's medical care, much less any decision regarding his pain medication. Plaintiff seems to rely exclusively on Dr. Wright's role as the DOCS Chief Medical Officer, and his overall responsibility for the DOCS medical staff (Pl.'s Mem. of Law at 18; Pl.'s Stmt. of Mat. Facts at 18-19), which is clearly insufficient to establish personal involvement and section 1983 liability.

Plaintiff claims that Supt. Payant, Dep. Supt. Rabideau, and FHSD Sharma are liable because they rejected various appeals of plaintiff's grievances and complaints involving his medication. (AC ¶ 35; Pl.'s Mem. of Law at 8-18; Pl.'s Stmt. of Mat. Facts at 10-19). It is clear that "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983[,]" particularly if the grievance involves medical care and the reviewer has no medical training. *Manley v. Mazzuca*, 01CV5178, 2007 WL 162476 at *10 (S.D.N.Y. January 19, 2007); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002)).[23] *See also Brock v. Wright,* 315 F.3d 158, 164 (2d Cir. 2003) (prison superintendent with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not "deliberately indifferent").

---

[23] "[I]t is alleged that [the superintendent] affirmed denial of a grievance against the two doctors for failing to provide care. But a prison administrator[, who was not a doctor,] is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so." *Joyner v. Greiner*, 195 F. Supp. 2d at 506.

Dr. Sharma was a supervising physician, and defense counsel acknowledges that he was minimally involved in plaintiff's care.  (Def.'s Mem. of Law at 15).  However, given the absence of any evidence of deliberate indifference on the part of plaintiff's two primary doctors–Drs. Burdick and Salvana–no reasonable jury could find that their supervisor was deliberately indifferent in failing to override their medical judgment.  (*See, e.g.*, Pl.'s Ex. 19).  *See, e.g., Smith v. Woods*, 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *9 (N.D.N.Y. March 20, 2008) (unless other members of the medical staff knew, or reasonably should have known, that the primary doctor was not appropriately treating plaintiff, but instead was engaged in deliberate indifference to his serious medical need, they could not be liable under the Eighth Amendment for failing to intercede in plaintiff's care).  *Cf. Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) ("A doctor associated with a prison cannot be held responsible for failing to intercede in the treatment of a prisoner simply because the prisoner button-holes him and insists that he do so. . . . [The] refusal to intervene in the medical treatment of another doctor's patient simply because the patient demanded it was objectively reasonable as a matter of law.")[24]

As to Nurse Nellenbach, she merely passed on to Dr. Salvana, the allegation

---

[24] To the extent plaintiff is alleging that any of these defendants failed to adequately investigate his complaints, it is clear there is no constitutional right to an investigation by government officials.  *Nieves v. Gonzalez*, 05-CV-00017, 2006 WL 758615 at *4 (W.D.N.Y. March 2, 2006) (collecting cases).  *See also Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

that plaintiff had been caught giving his morphine to another patient in June 2006. Dr.
Salvana then made the medical judgment to change the form of plaintiff's morphine
from a tablet to a liquid. The claims against defendant Nellenbach would also be
subject to dismissal because, as a nurse, she lacked the authority to override the
medical decision of the treating prison physician. *See, e.g., Smith v. Woods*, 2008 WL
788573 at *9 (social worker and psychologist in prison had no authority to override
the decision of the treating psychiatrist regarding appropriate medication for an
inmate/patient; further, they had no reason to know that the psychiatrist was not
appropriately treating the plaintiff). *See also Cuoco v. Moritsugu*, 222 F.3d at 111
(the failure of non-doctors at a prison to intercede in the medical treatment of an
inmate in not unreasonable, because they lack the authority to intervene in medical
decisions).

### 2.   Temporary Deprivation of "Roho" Support Board

Plaintiff alleges that when he was moved to a different housing unit at RMU on
November 27, 2007, a support board for the "Roho" cushion in his wheelchair was
confiscated by defendant LaMarca, a corrections officer ("C.O."), who stated that the
board was contraband–a checkerboard taken from another wing at RMU. (AC ¶ 37;
12/28/07 LaMarca Mem., Dkt. No. 124-5 at 4). Plaintiff filed a grievance, claiming
that the seized board was not a checkerboard and, that without the board, the seat
cushion in plaintiff's wheelchair sagged, causing him "unnecessary pain." (AC ¶ 38;
Grievance MHK 10552-07, Dkt. No. 124-5 at 5-6, 12). The grievance was denied by
Supt. Payant, based, in part, on the advice from defendant Connarton, plaintiff's

occupational therapist, that the confiscated board was a checkerboard, and that a board was not necessary to provide further support for plaintiff's high-profile Roho wheelchair cushion.  (AC ¶ 39; Dkt. 124-5 at 8-9, 12; MR 1795-1796).  Defendant Connarton continued to assess plaintiff's needs with respect to his wheelchair, and, based on plaintiff's further complaints, issued him a wheelchair board on February 7, 2008.  (MR 1795).[25]  Medical Progress Notes document that, before and after plaintiff's complaints about the support board, defendant Connarton monitored issues relating to plaintiff's wheelchair and periodically took steps to remedy any problems. (See, e.g., MR 1796-1798, 1803, 1811; Dkt. No. 124-5 at 12).

Plaintiff alleges that, as a result of losing the support board for his Roho chair for a couple of months, he was caused "undo [sic]" and "unnecessary" pain in his back and, perhaps, also pain relating to his pressure ulcers.  (Dkt. No. 124-5 at 5-6, 12). Plaintiff's unsupported claim that "my back is really hurting me" because of the absence of a support board (*Id.*), would not constitute the type of "extreme" or "chronic and substantial" pain necessary to satisfy the objective elements of the Eighth Amendment standards.  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1996) ("extreme" pain); *Salahuddin v. Goord*, 467 F.3d at 280 ("chronic and substantial"

---

[25] In his Progress Notes, Occupational Therapist Connarton observed that plaintiff did not make clear, until his February 7, 2008 appointment, that, without a support board, plaintiff's Roho cushion sagged through the back of the wheelchair seat.  (MR 1795).  With the assistance of defense counsel, plaintiff obtained an affidavit from inmate Francis Auleta, who was present when defendant Connarton delivered plaintiff's new support board in February 2008.  Inmate Auleta observed that the **new** board was not a checkerboard; however, that observation does not resolve the issue of whether the **original** board confiscated from plaintiff was, in fact, a checkerboard.  Based on the court's findings that plaintiff does not state an Eighth Amendment claim in any event, it is not material whether the confiscated board was a prison checkerboard.

pain). *See also Veloz v. New York*, 339 F. Supp. 2d 505, 525-26 (S.D.N.Y. 2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Phillips v. Goord*, 08-CV-0957, 2009 WL 909593 at *6 (W.D.N.Y. Apr. 1, 2009) (allegations of "chronic" back pain do not support a claim that plaintiff had a "serious" medical condition).  To the extent plaintiff is complaining about the aggravation of his pressure ulcers, his persistent failure to follow medical advice and cooperate with the medical staff in the treatment of this condition, as discussed above, vitiates his argument that the temporary absence of the support board was a serious medical deprivation.

In any event, no reasonable jury would find that any of the named defendants, to the extent they were personally involved with medical decisions involving plaintiff's Roho support board, acted with deliberate indifference to plaintiff's serious medical needs.  Occupational Therapist Connarton, who, as noted above, was consistently attentive to problems relating to plaintiff's wheelchair, made an initial medical judgment that the support board was unnecessary.  When plaintiff continued to complain, defendant Connarton provided plaintiff with a new Roho board, which negates the claim that he was deliberately indifferent to plaintiff's needs.  C.O. LaMarca was not on the medical staff, and had no reason to know of the medical consequences (if any) of his confiscation of the support board, whether or not it was a contraband checkerboard.  Based on the authority cited above, Supt. Payant, or anyone else without a medical background involved with addressing plaintiff's complaints or grievances involving the support board, did not act with deliberate indifference to

plaintiff's medical needs by deferring to the medical judgment of plaintiff's occupational therapist.[26]

### 3.    Whirlpool

Plaintiff alleges that, after he was transferred to the Mohawk disciplinary wing on November 27, 2007, he was allowed to use only an "obsolete" and unsanitary whirlpool unit in that part of the facility.  Plaintiff claimed that the E-wing whirlpool had a manual foot crank for lowering the patient chair, which jarred his body and caused him "considerable pain."  (AC ¶¶ 46-48; Pl.'s Stmt. of Mat. Facts at 28 (now claiming it was "excruciating" pain)).  The amended complaint charges that Dep. Supt. McCarthy was deliberately indifferent to plaintiff's health because he refused to reduce plaintiff's disciplinary sentence in order to let him return to the A-wing in December 2007.  (AC ¶¶ 47-48).

Plaintiff filed a prior grievance relating to the E-wing whirlpool in April 2007, in response to which, the Nursing Supervisor reported that the machine had been inspected and found to be sanitary and in proper working order.  Plaintiff agreed that his grievance had been resolved based on his reported satisfaction with the response by the nursing supervisor.  (Dkt. No. 124-3).[27]

---

[26] Plaintiff also names Dep. Supt. Rabideau in connection with this claim (AC ¶ 41), although he alleges no facts indicating that she had any involvement in the decisions regarding plaintiff's Roho support board.

[27] Although plaintiff wrote, on the grievance form, "read response by nursing supervisor and was satisfied with reply" (Dkt. No. 124-3 at 1), he now denies that he read the report that maintenance had checked the machine and found it operable and sanitary.  (Pl.'s Stmt. of Mat. Facts at 28 (plaintiff had no knowledge of statement written on Pl.'s Ex. 389 (a copy of which appears at Dkt. No. 124-3 at 3)).

The court concludes that no reasonable fact finder would conclude that requiring plaintiff to use only the E-wing whirlpool for several months caused a serious negative impact on his health that would satisfy the objective prong of the constitutional standards for medical care.  Plaintiff's claim that the manual foot crank caused him "considerable" or "excruciating" pain is dubious, given that he had no physical sensation in his lower body (see MR 821).  No reasonable jury would find that the alleged "jarring" caused by lowering plaintiff, seated, into the whirlpool caused "extreme" or "chronic and substantial" pain required to support a Eighth Amendment cause of action.  *Hathaway v. Coughlin*, 37 F.3d at 66; *Salahuddin v. Goord*, 467 F.3d at 280.

In any event, plaintiff frequently refused opportunities to use the whirlpool or bathe, both before and after his stay on E-wing, which was part of a larger pattern of impeding his treatment, at the risk of aggravating his skin ulcers and increasing his risk of infection. (*See, e.g.*, MR 381 (consecutive days refusing to bathe), 1724, 1730, 1732, 1734, 1736, 1740, 1746, 1748, 1756, 1764, 1776, 1774, 1776, 1784, 1786).  On one occasion, just after he was moved to the E-wing, plaintiff refused an opportunity to go use his preferred whirlpool on the C-wing, claiming that he would get an infection traveling to the other wing.  (MR 809; *see also* Dkt. No. 124-3 at 1).  There is no plausible evidence supporting plaintiff's suggestion that the relatively brief limitation on his choice of whirlpool machines, as opposed to his own persistent resistance to medical advice and treatment, caused or exacerbated any serious medical condition.  (*See* authority cited in note 11, above).

Even if plaintiff could satisfy the objective prong of the Eighth Amendment standards for medical care, no reasonable jury would find that Dep. Supt. McCarthy, the only defendant named in connection with the whirlpool claim, acted with deliberate indifference to plaintiff's serious medical needs.  As a non-medical prison administrator, defendant McCarthy would reasonably defer to the medical staff as to whether requiring plaintiff to use the E-wing whirlpool would have a serious negative effect on plaintiff's health.[28]  Even if the medical staff misjudged plaintiff's claims of pain from the whirlpool or the risk to his health from limiting him to the E-wing machine, that would, at worst, constitute malpractice, not deliberate indifference.

### 4.    Denial of Clinitron Bed

The Amended Complaint alleges that, by failing to secure a "Clinitron" bed for plaintiff when he arrived at RMU,[29] Dr. Burdick was deliberately indifferent to plaintiff's medical needs, causing him to suffer serious complications ultimately requiring the removal of his bladder and colon in February 2008.  (AC ¶ 50).  In his

---

[28] Plaintiff points to an entry by Dr. Salvana in the medical records in late December 2007 that plaintiff would "benefit from" the use of the newer whirlpool machines on the A- and C-wings.  (Pl.'s Stmt. of Mat. Facts at 20-21; MR 838).  Assuming that defendant McCarthy was aware of that note, it does not constitute a medical order.  In any event, plaintiff's earlier refusal to be transported from E-wing to C-wing so that he could use a newer whirlpool (MR 809) supports the impression of defendant McCarthy that plaintiff was making manipulative treatment demands, designed to secure an early termination of his disciplinary confinement.  *See* 1/2/08 McCarthy Mem. (Pl.'s Ex. 29) (Dep. Supt. for Security notes his suspicion that plaintiff was trying to circumvent disciplinary penalties with dubious claims that he needs particular therapeutic activities).

[29] Dr. Burdick was aware that plaintiff apparently had used a Clinitron bed at Bellevue Hospital in March 2006, and that plaintiff's Comprehensive Medical Summary from Rikers Island stated that he needed a Clinitron bed.  (Burdick Decl. ¶ 22; Pl.'s Exs. 181, 449, 451).  When plaintiff came to the Walsh RMU in May 2006, he expressed displeasure that the facility did not have this brand of bed.  (MR 370).

submissions in opposition to defendants' summary judgment motion, plaintiff claims that Dr. Burdick told him that Clinitron bed was not available for budgetary reasons. (Pl.'s Stmt. of Mat. Facts at 44; Pl.'s Mem. of Law at 46).

Dr. Burdick, although he has no recollection of being involved in the selection of plaintiff's mattress, notes that, according to his medical records, plaintiff was initially provided with a mechanically adjustable bed with a special air mattress that had "similar properties" to the Clinitron model. (Burdick Decl. ¶ 23; Salvana Decl. ¶ 17; MR 371, 415, 417).[30]  In a December 2008 grievance about the replacement of his originally-issued air mattress with another, allegedly inferior air mattress, plaintiff acknowledged that his first air mattress, like a Clinitron bed, allowed him to transfer from bed to his wheelchair without assistance.  (Dkt. No. 124-8 at 3, 4-5).[31]

Plaintiff's medical record demonstrates that he has had surgeries upon his bowel and bladder necessitated by the development of "sinus tracks" and other chronic complications of his pre-incarceration gunshot wounds.  (Burdick Decl. ¶ 21, 24; *see, e.g.*, MR 1032, 1061, 1077, 1098, 1099, 1101-1102, 1108, 1114-1115, 1128).  Both

---

[30] According to Dr. Burdick, RMU provided the same mattress to other paraplegic inmates during his service, and it has proven its value.  The mattress "fully supported inmate Emerson's body and, if he chose to do so, enabled him to vary his resting and sleeping positions." (Burdick Decl. ¶ 23).  Dr. Salvana noted that other patients with medical conditions similar to plaintiff have used the same type of air mattress with no adverse effects.  (Salvana Decl. ¶¶ 17-18).

[31] In his papers in opposition of defendants' summary judgment motion, plaintiff claims that he was impeded in efforts to file an earlier grievance concerning the initial decision to deny him a Clinitron bed in May 2006.  (Pl.'s Stmt. of Mat. Facts at 44; Pl.'s Mem. of Law at 44-47). Given that the defendants are not arguing that plaintiff failed to exhaust his administrative remedies regarding this claim, plaintiff's alleged inability to file a grievance in May 2006 is not relevant.

Drs. Burdick and Salvana expressed their medical opinions that the conditions that required plaintiff to have further surgery were not caused by the bed he was provided. (Burdick Decl. ¶ 24; Salvana Decl. ¶ 16).  Plaintiff has offered no medical evidence indicating a causal relationship between his need for further bladder and colon surgery and the brand of mattress he was provided.[32]  Moreover, the medical records document that plaintiff may have caused further deterioration of his own medical condition by his failure to heed medical advice, *e.g.*, about periodically changing his position in bed and not spending so much time in his wheelchair.  (Burdick Decl. ¶¶ 14, 25-27 (citing medical records); Salvana Decl. ¶¶ 19-20).[33]  No reasonable jury could conclude that the type of mattresses provided to plaintiff at RMU, as opposed to his severe prior injuries and/or his self-destructive behaviors, caused the serious medical consequences plaintiff claims.  *See, e.g., Llorente v. Rozeff*, 99-CV-1799 (HGM), 2001 WL 474261, at *4 (N.D.N.Y. Apr. 12, 2001) (at the summary judgment stage, a plaintiff who complains that deficient medical treatment gives rise to an Eighth Amendment violation must present verifying medical evidence from the record to establish the detrimental effect of the treatment).

    In any event, even if Dr. Burdick was personally involved in the choice of

---

[32] Plaintiff argues only that he did not develop the sinus tracks, which contributed to the need for further surgery (Burdick Decl. ¶ 24 (citing medical records)), until plaintiff was moved to RMU, where he was denied a Clinitron mattress.  (Pl.'s Stmt. of Mat. Facts at 45; Pl.'s Mem. of Law at 48).  That is clearly insufficient to raise an issue of fact in light of the contrary medical opinion of plaintiff's two treating physicians.

[33] Plaintiff claims, without citing any supporting medical evidence, that the Clinitron bed does not require repositioning of the patient to prevent bed sores.  (Pl.'s Stmt. of Mat. Facts at 45; Pl.'s Mem. of Law at 47) .

plaintiff's mattress, no fact finder would conclude that he acted with deliberate indifference to plaintiff's health.  Based on authority cited above, a medical judgment that this air mattress was appropriate for plaintiff's care (*see* note 30), does not support an Eighth Amendment claim, even if plaintiff would have preferred a different brand of bed, or if the doctor's judgment constituted malpractice.

## V.    Eighth Amendment–Conditions of Confinement

### A.    Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong."  *Hathaway v. Coughlin*, 37 F.3d at 66.  Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation.  *Id.* (quoting *Wilson v. Seiter*, 501 U.S. at 298).  "Because

society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66.

## B.   Application

After being transferred to the Mohawk disciplinary wing on November 27, 2007, plaintiff complained that the cell was "very cold," and the windows were drafty. Plaintiff requested extra blankets, but claims that C.O.s Malloni and Meachum, while referencing unspecified prior grievances plaintiff had filed against them, directed the medical staff to not to provide extra bedding.[34]   Plaintiff also asserts that the officers

---

[34] The medical notes for the evening of November 27th indicate that plaintiff did complain loudly that his room was cold. The only comments attributed to corrections officers in the progress notes was their statement to plaintiff that the heat could not be turned up until the next day. (MR 807-808).

"[tried] to make [him] remove his hat in attempt to stay warm."  (AC ¶¶ 42-43).[35]

Plaintiff filed a grievance about the temperature in his cell on November 29th, (Dkt. No. 124-6), and alleges that he was denied "sufficient and/or adequate heating" from November 27, 2007 until approximately December 11th, when maintenance turned up the heat.  (AC ¶ 44).  He also claims that FHSD Sharma falsely advised grievance officials that plaintiff's windows were caulked; plaintiff insists that he suffered with drafty windows until he was moved to another cell on E-wing on December 18th.  (AC ¶ 45; Dkt. No. 124-6 at 7-8; Pl.'s Mem. of Law at 31; Pl.'s Ex. 485 (DOCS found no record of a work order pertaining to heating or caulking for the period 11/27/07-12/11/07).  The amended complaint alleges that defendants Malloni, Meachum, Sharma, and Payant[36] violated plaintiff's Eighth Amendment rights by subjecting him to cruel and unusual conditions of confinement.  (AC ¶ 45).

The medical staff saw plaintiff several times per day in his E-wing cell between November 27th and December 11th, and the corresponding progress notes make no

---

[35]   In his opposition to the defendants' summary motion, plaintiff documents that defendants Malloni and Meachum filed an Inmate Misbehavior Report against plaintiff on November 27, 2007.  In the report, the defendants charge that, when C.O. Malloni looked into plaintiff's cell, he found plaintiff with a bed sheet over his head, and ordered him to remove it so that the staff could see, from outside, whether he was "OK."  Plaintiff reportedly replied with profanity, and refused to remove the sheet.  C.O. Malloni later also ordered plaintiff to remove his winter hat, and checked with the nurse to make sure there was no medical order allowing plaintiff to wear the hat, as plaintiff claimed.  The misbehavior report indicates that plaintiff was not wearing his pajama top, and refused orders to put it on.  Defendant Malloni charged plaintiff with refusing a direct order, making threats, obscene/harassing language, interference with an employee, and lying.  (Pl.'s Ex. 474).  After a disciplinary hearing, plaintiff pled guilty to refusing a direct order and harassment, and was found not guilty on the other charges.  (Pl.'s Ex. 475, 480-481).

[36] Superintendent Payant concluded that plaintiff's complaints were addressed when his windows were caulked and the temperature raised in his cell.  (Dkt. No. 124-6 at 4).

reference to cold temperatures in plaintiff's cell following his initial complaints in the immediate aftermath of his transfer.  (MR 807-841).[37]  Plaintiff's treating physicians both noted that, when they visited plaintiff in his cell, it was usually uncomfortably warm, and they did not recall his room or adjoining areas ever being unduly cold while he was confined on E-wing.  (Burdick Decl. ¶ 33; Salvana Decl. ¶ 25).

It is clear that exposing inmates to severe cold for a prolonged period of time is a serious deprivation within the ambit of the Eighth Amendment.  *See, e.g., Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (reversing grant of summary judgment dismissing Eighth Amendment claim where inmate established that he had been exposed to sub-freezing temperatures for most of a three-month period in fall and winter); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (summary judgment on Eighth Amendment claim not appropriate where inmate established that he had been subjected to, *inter alia*, temperatures near or well below freezing for a five-month period during the winter).  *See also Wright v. McMann*, 387 F.2d 519, 521-522, 526 (2d Cir. 1967) (reversing Rule 12(b)(6) dismissal of Eighth Amendment claim alleging that inmate was, *inter alia*, stripped completely naked and exposed to sub-freezing temperatures for 11 days during winter in Upstate New York, then was provided a "thin pair of underwear" for another 22 days under similar conditions, and then, a year later, was confined for 21 days under similar conditions).  Even assuming plaintiff's allegations are not exaggerated, he was not subjected to cold conditions that

---

[37] Plaintiff documents that he did complain his cell was "freezing" during a disciplinary hearing on December 4, 2007.  (Pl.'s Exs. 479, 481).

were so prolonged or severe that they would support an Eighth Amendment claim.

At worst, the record reveals that plaintiff spent approximately two weeks in a cell which, by his standards, had inadequate heat.  Plaintiff's grievance demanded that the temperature in his room be raised to 75 to 80 degrees, suggesting that he was never subjected to temperatures even approaching cold, much less freezing.  (Dkt. No. 124-6 at 4, 8).[38]  Whether or not his windows were effectively caulked, they were intact, and plaintiff admits that prison officials did turn up his heat enough to meet even his standards for comfort after two weeks.  Such conditions do not rise to the level that would satisfy the objective prong of Eighth Amendment standards for conditions of confinement.  *See, e.g., Trammel v. Keane*, 338 F.3d 155, 158-159, 164-65 (2d Cir. 2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on (1) deprivation of all property except one pair of undershorts and (2) exposure to "bitter cold," because the temperatures to which

---

[38] In opposition to the summary judgment motion, plaintiff began to characterize the conditions in his cell in more stark terms, such as "hazardous to [his] health," "freezing," "like an ice box," and "extremely" or "unbearably" cold.  (Pl.'s Stmt. of Mat. Facts at 28-29; Pl.'s Mem. of Law at 31).  However, plaintiff's papers also acknowledge that he was able to keep warm by staying fully dressed.  (Pl.'s Mem. of Law at 31; Pl.'s Stmt. of Mat. Facts at 30).  Because plaintiff was able to maintain warmth with the clothing provided, the conditions in his cell, even if colder than suggested by the Amended Complaint, would still not meet the objective prong of the applicable Eighth Amendment standards.  *See, e.g., Thompson v. Carlsen*, 9:08-CV-0965 (FJS/ATB), 2010 WL 3584409, at *9-10 (N.D.N.Y. Aug. 16, 2010) (plaintiff subjected, for three weeks, to very cold temperatures in his cell, caused, in part, by an open air vent, did not establish cruel and unusual conditions, in part because he was able to maintain warmth with heavy winter clothes provided) (Report-Recommendation), adopted, 2010 WL 3584396 (N.D.N.Y.  Sept. 7, 2010); *Brown v. McElroy,* 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he apparently had clothing and was able to get some warmth with blankets, and provide himself with livable conditions).

inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing–17 days–was not long enough); *Scot v. Merola*, 555 F. Supp. 230, 233-234 (S.D.N.Y. 1983) (granting Rule 12(b)(6) motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area with broken windows and without heat, where the temperature dropped below fifty degrees); *Davis v. Buffardi*, 01-CV-285, 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (granting defendants' motion for summary judgment dismissing claim of inadequate prison conditions based on denial of extra blankets and clothing for ten days in February, when the prison's boiler was not working, because pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm").

In any event, the defendants named in the Amended Complaint would not be liable under section 1983, even if the plaintiff could otherwise survive a summary judgment motion on his Eighth Amendment claim involving conditions of confinement.  Defendants Sharma and Payant were involved with the conditions of plaintiff's confinement in the E-wing only to the extent they were prison administrators who had input on his grievances.  Based on the authority cited above, that would be insufficient to establish their personal involvement in any Eighth Amendment violation, even if one were established.

As to defendants Malloni and Meachum, plaintiff alleges they played a role in the conditions of his confinement on E-wing only for the first day he was confined there.  Even if plaintiff spent one cold evening without enough blankets, that would

not support an Eighth Amendment claim against these defendants.[39]  To the extent

plaintiff is asserting a First Amendment retaliation claim against C.O.s Malloni and

Meachum, one evening without an extra blanket or hat would not, based on the

authority cited below, constitute the type of "adverse action" that would support a

retaliation claim.

## VI.   ADA/Rehabilitation Act

Plaintiff's claim against DOCS that he was effectively deprived of the ability to

participate in outdoor exercise as a result of his disabilities, is the only cause of action

under the ADA and section 504 of the Rehabilitation Act that survived Chief Judge

Mordue's ruling on defendants' motion to dismiss.  (Dkt. No. 49 at 27-30).[40]  Without

---

[39] *See, e.g., Smith v. Burge*, No. 9:03-CV-0955 (LEK/GHL), 2006 WL 2805242, at *7 (N.D.N.Y. Sept. 28, 2006) (confinement of inmate, for less than one day, in a T-shirt and underwear, in a cell with an open window, exposing him to "cold" or "very cold" temperatures, was not sufficiently prolonged or severe to rise to the level of an Eighth Amendment violation); *Borges v. McGinnis*, 03-CV-6375 , 2007 WL 1232227, at *4-6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation); *Grant v. Riley*, 89 Civ. 0359, 1993 WL 485600 at *4 (S.D.N.Y.  Nov. 24, 1993) (confining inmate for three days, in an unheated room with a cold wind blowing through a broken window, and denying him a coat, bedding or blankets for over nine hours, failed to allege treatment that offends concepts of dignity, civilized standards, humanity, and decency, as required to state an Eighth Amendment cause of action).

[40] As Chief Judge Mordue recognized, the ADA and RA afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities.  *Id.* (citing *Farid v. Demars*, 9:06-CV-1545 (TJM/GJD), 2009 WL 455450, at *4-5 (N.D.N.Y. Feb. 23, 2009)).  *See also  Hardy v. Diaz*, 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at *9 (N.D.N.Y. Mar. 30, 2010) (to the extent plaintiff is only challenging the medical treatment of his underlying medical condition, he may not proceed under either the ADA or the Rehabilitation Act) (Report-Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010).

resolving whether the Eleventh Amendment in this case would bar such a damage claim against a state entity,[41] the court finds that plaintiff's claim under the ADA and/or section 504 should not survive summary judgment.

### A.   Legal Standards

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "To assure that those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual."  *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citations omitted).  Similarly, section 504 of the Rehabilitation Act declares, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Title II of the ADA and section 504 are applicable to inmates in state prisons. *Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005).  In order to state a claim

---

[41] *See e.g. Shariff v. Coombe*, 655 F. Supp. 2d 274, 304 (S.D.N.Y. 2009) ("Although the Supreme Court has held that Title II [of the ADA] validly abrogates a state's sovereign immunity 'insofar as [it] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment,' the Court has not explicitly defined the extent to which Title II validly abrogates sovereign immunity for conduct that violates Title II but does not violate the Constitution." (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)); *Farid v. Demars*, 2009 WL 455450 at *7-8.  As discussed in note 45, below, the alleged conduct related to the ADA claim would not violate any constitutional rights.

under the ADA, a prisoner must establish that: "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Id.* (citations omitted).  The standards for an inmate's claim under section 504 are generally the same as an ADA claim.  *See Id.* at 113 n.2 (the most significant distinction between the two statutes is that Title II of the ADA applies to all state and municipal governments, while section 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted); *Harris v. Mills*, 572 F.3d at 73.  At least for a Title II ADA claim sounding in equal protection, the plaintiff may also need to establish that the deprivation of a program or activity was "motivated by discriminatory animus or ill will due to disability."  *Garcia v. S.U.N.Y. Health Science Center of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001).[42]

---

[42] Title II of the ADA contains a section specifically stating that a state shall not be immune under the Eleventh Amendment from a court action for a violation of the ADA.  42 U.S.C. § 12202.  *Garcia* held that, for this abrogation of sovereign immunity to comport with Congress's authority to enforce the Fourteenth Amendment by appropriate legislation, under section 5 of that amendment, Title II monetary claims against the state could be maintained only if the plaintiff established "discriminatory animus or ill will based on the plaintiff's disability." 280 F.3d at 111.  Since the *Garcia* ruling, two Supreme Court decisions have called into question whether the "discriminatory animus or ill will" standard is still valid.  *See Bolmer v. Oliveira*, 594 F.3d 134, 146-48 (2d Cir. 2010) (citing cases) (standard does not apply to an ADA claim based solely on a substantive due process objection to involuntary commitment, as opposed to an Equal Protection claim).  Specifically, in *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court allowed a private cause of action for damages under Title II where the plaintiff claimed that his right of access to the courts had been violated.  Subsequently, in *United States v. Georgia*, 546 U.S. 151, (2006), the Court permitted a private cause of action for conduct that "actually violates the Fourteenth Amendment."  546 U.S. at 159.  In doing so, the *Georgia* decision left it for lower courts to determine, on a claim-by-claim basis, whether the ADA's

## B.    Application

The defendants acknowledge, and Chief Judge Mordue previously found, that plaintiff is disabled and entitled to the protections afforded by the ADA and section 504.  (Dkt. No. 49 at 28).  Plaintiff alleges that he was "effectively deprived" of one hour of daily outdoor exercise during the winter of 2007-2008 because DOCS staff did not promptly provide him with his own personal winter parka, gloves, and long underwear, and because the outdoor exercise area was sometimes difficult to navigate in a wheelchair due to snow and ice.  (AC ¶¶ 51-55).  Plaintiff also complains that he filed various grievances and requests for accommodations he purportedly needed to participate in outdoor exercise, but that various Mohawk and DOCS administrators did not respond in an appropriate and/or timely fashion.  (AC ¶¶ 61, 63; Pl.'s Stmt. of Mat. Facts at 37; Pl.'s Mem. of Law at 37, 39-40).

Chief Judge Mordue previously found that outdoor exercise is a program or activity within the ambit of the ADA and section 504; so that if plaintiff were

---

purported abrogation of sovereign immunity was valid as to misconduct that violated Title II, but did not violate the Fourteenth Amendment.  546 U.S. at 158-59.  District courts in this Circuit "have come to different conclusions as to whether *Garcia* is still good law in light of *Lane and Georgia*."  *Cole v. Goord*, 05 Civ. 2902, 2009 WL 2601369, at *7 (S.D.N.Y. Aug. 25, 2009) (citing cases).  *See also Sharif v. Coombe*, 655 F. Supp. 2d at 304 ("after a close reading of *Garcia*, this Court concludes that Garcia's requirement that a Plaintiff demonstrate 'animus or ill will' to recover monetary damages under Title II survives those recent Supreme Court decisions").  The Second Circuit has not ruled on the question.  *Bolmer v. Oliveira*, 594 F.3d at 148 ("Whether or not *Garcia* survives *Lane* and *Georgia*, a question we do not reach . . . .").  Because this court would grant summary judgment with respect to plaintiff's ADA claim for other reasons, I need not "delve into [the] deep constitutional waters," relating to the legal issues implicated by *Garcia*, *Lane*, and *Georgia.  See Cole v. Goord*, 2009 WL 2601369, at *7.  In any event, as discussed below in note 45, the court concludes that no DOCS employee involved with plaintiff's access to outdoor recreation, acted with discriminatory animus or ill will, or with a state of mind necessary to establish an Eighth Amendment or other constitutional violation.

excluded from or denied the benefit of outdoor exercise solely because of his disabilities, he would state a viable cause of action.  (Dkt. No. 49 at 28, 29).  *See also Beckford v. Irvin*, 49 F. Supp. 2d 170, 184 (W.D.N.Y. 1999) (upholding ADA judgment and award of damages to wheelchair-bound plaintiff was denied outdoor recreation during the entire period of the suit).  However, the court concludes that no reasonable juror would find that the plaintiff was excluded from participation in or denied the benefit of outdoor exercise because DOCS failed reasonably to accommodate his disabilities, as would be required to support a claim under the ADA or section 504.

The original complaint (Dkt. No. 1) and exhibits submitted by plaintiff in opposition to defendants' summary judgment motion acknowledge that he generally had access to a "community coat," but that he chose not to wears coats shared among other inmates because he felt they were unsanitary and increased his risk of infection. (Dkt. No. 49 at 4; Compl. ¶ 51; *see, e.g.*, Pl.'s Exs. 407-409, 416; *see also* MR 323, 326, 337, 817 (discussion with plaintiff about individual coats)).  After plaintiff complained about the community coats in November 2007, he was provided with his own coat in late January or early February 2008;[43] but that coat was lost when plaintiff was moved to segregated housing, and the coat was not replaced for approximately 60 days.  Plaintiff also complained that the first personal coat he was provided was unsuitable, given his disabilities, because of the position of the pockets.  (Dkt. No. 49

---

[43] Plaintiff's various pleadings and submissions are inconsistent about the date he was first provided an individual coat.  (*Cf.* Compl. ¶ 51; Pl.'s Ex., Dkt. No. 113-19 at 2 (1/25/08) and Pl.'s Stmt. of Mat. Facts at 31; Pl.'s Mem. of Law at 35 (early February 2008)).

at 4; Compl. ¶ 51; Pl.'s Stmt. of Mat. Facts at 31; Pl.'s Mem. of Law at 32-33; *see, e.g.*, Pl.'s Exs. 418-B, 419, 422-A).  In mid-February 2008, Dr. Salvana wrote medical orders for both a coat and gloves for plaintiff, and he was provided those items by the security staff.  (Pl.'s Stmt. of Mat. Facts at 31; Pl.'s Exs. 424-426).  Starting in October 2008, all RMU inmates were issued personal coats for outdoor recreation and transportation.  (Pl.'s Ex. 439, Adm. 1 & 5).

Plaintiff's mobility and exercise needs were addressed by occupational and physical therapy, including during the winter months.  (*See, e.g.*, MR 1791-1796, 1808-1810, 2284-2286).  As discussed above, plaintiff frequently ignored the direction of the RMU medical staff about physical activity, maintaining personal hygiene, and taking other steps to avoid infection and aggravation of his skin ulcers and other medical conditions.  Given the documentary evidence that plaintiff often neglectfully exposed his skin to his own feces and urine and refused dressing changes, his claim that he could not go outdoors to exercise in a "community" coat because of the risk of infection, is dubious, at best.  The fact that plaintiff often ignored the entreaties of the staff to get out of bed for therapeutic activities, as documented above, further evidences a complete lack of factual support for his claims that his lack of participation in outdoor exercise during the winter was caused by the failure of the Mohawk staff to make reasonable accommodations to his disabilities.  *See, e.g., Cole v. Goord*, 2009 WL 2601369, at *1, 10 (claim that plaintiff, who found it difficult and painful to negotiate stairs, was prevented from attending Muslim services on a different floor, was vitiated by the evidence that he was given an elevator pass, but

that he often did not feel like waiting for the required escort to accompany him to and from services). While there were clearly some delays in providing plaintiff with the particular outdoor clothing he demanded, no reasonable jury would conclude that these delays were the cause of any deprivation of outdoor exercise.

On November 24, 2008, plaintiff filed a grievance about ice and snow in the outside exercise area, which resulted in the implementation of a policy on December 11th, which assigned responsibility for shoveling an adequate area to facilitate outside exercise. (Dkt. No. 124-7 at 3, 6). On January 6, 2009 (the following winter), plaintiff filed another grievance complaining that, although the outside exercise area had been shoveled prior to his recreation time, more snow had accumulated by the time he was released to the yard. In response to this grievance, it was noted that plaintiff had a mobility assistant available when needed, and DOCS directed that some alternate form of exercise be made available to plaintiff when continuing snow made outdoor exercise impractical. (Dkt. No. 124-9 at 1, 3). While plaintiff acknowledged that the remedial accommodations taken by the Mohawk staff in response to his complaints were good "in theory," he complains that they more than "occasional[ly]" failed in practice to facilitate his outdoor exercise during the winter. (Pl.'s Stmt. of Mat. Facts at 35-36; Pl.'s Mem. of Law at 38). In support of that complaint, however, plaintiff only cites to the two above-referenced grievances regarding allegedly deficient snow removal from the outdoor exercise area on two occasions (Pl.'s Exs. 610, 620), and a grievance which covered the temporary denial of a personal coat and gloves (Grievance # MHK-10655-08, Pl.'s Ex. 541(noting that the plaintiff's request

45

for a parka and gloves had been accommodated)).  (Pl.'s Stmt. of Mat. Facts at 35-36).

To the extent snow was not always removed from plaintiff's outdoor exercise area as thoroughly or as promptly as he would have liked, it may have sometimes been more difficult for him to exercise outdoors; but such infrequent incidents did not prevent plaintiff from participating in this program or activity or subject him to a substantial risk to his health or safety.  *See, e.g., Burgess v. Goord*, 98 Civ. 2077, 1999 WL 33458, at *7 (S.D.N.Y. Jan. 26, 1999) (the fact that disabled plaintiff's inaccessibility to his cane and the elevator made it more difficult for him to attend outdoor exercise or religious services is not tantamount to stating a claim of exclusion"); *Cole v. Goord*, 2009 WL 2601369, at *10-11 (plaintiff, who needed leg braces and cane to walk, pursued an ADA claim based, *inter alia*, on the lack of guard rails in the showers and allegedly unsatisfactory shower chairs; while these accommodations may have been "less than ideal," inmate was not prevented from taking showers and was not injured using the chairs provided); *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 443 (S.D.N.Y.2004) (allegation that inmate was housed a distance away from such prison services as the law library and infirmary, and that he had difficulty walking to them, does not state an ADA claim that he was prevented from accessing them).[44]  The Mohawk staff provided reasonable accommodations to make outdoor exercise accessible to plaintiff, *e.g.*, by specifically

---

[44] *Cf.  Allah v. Goord*, 405 F. Supp. 2d at 280 (even if a plaintiff is not wholly precluded from a service, if he is at risk of incurring serious injury each time to attempts to take advantage of the service, surely he is denied the benefit of the service under the ADA) (distinguishing *Carrasquillo).*

assigning responsibility for snow removal and making an accessibility aide available to plaintiff when needed. *See, e.g., Cole v. Goord*, 2009 WL 2601369, at *9 (Title II does not require the state to employ any and all means to make services accessible to persons with disabilities; where structural accommodations are likely to be more difficult, the state may adopt alternative measures, such as assigning aides to assist the disabled person in accessing services).[45]

---

[45] This court concludes that no reasonable jury would find that the DOCS employees involved with plaintiff's access to outdoor recreation during the winter acted with "discriminatory animus or ill will based on the plaintiff's disability." As noted above, DOCS responded to plaintiff's grievances by making reasonable accommodations, albeit not as promptly as plaintiff desired. As plaintiff implicitly acknowledges, some of the circumstances that temporarily complicated plaintiff's participation in exercise resulted from his frequent misconduct and resulting security restrictions. (Pl.'s Stmt. of Mat. Facts at 33-34; Pl.'s Ex. 29 (1/2/08 Mem. of Dep. Supt. for Security noting his suspicion that plaintiff was trying to circumvent disciplinary penalties with claims that he needs particular therapeutic activities)). In the larger context of the continuous attention the RMU staff gave to plaintiff's disabilities and health issues, the delays in reasonably accommodating plaintiff's often difficult demands did not reflect discriminatory animus required to establish an Equal Protection violation. *See, e.g., Shariff v. Coombe*, 655 F. Supp. 2d at 304-305 (making accessibility improvements and other accommodations over time is not consistent with harboring ill will towards disabled inmates, even if plaintiffs complained that the accommodations should have been made more swiftly); *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 220-21 (N.D.N.Y. June 29, 2001) (finding no discriminatory intent behind denial of plaintiff's access to outdoor recreation to the extent it was caused by impassable wheelchair ramp, which was promptly repaired after prison officials were advised of the problem, and punitive restrictions appropriately imposed on plaintiff). In trying to support his claim that the RMU staff displayed discriminatory animus because of his disabilities, plaintiff points to the declaration of inmate grievance representative Francis Auleta, which was obtained with the assistance of defense counsel. (Dkt. 129-2). The declaration states that FHSD Sharma seemed to have "a hostile demeanor" towards plaintiff during the few times inmate Auleta saw the FHSD and the plaintiff interact. (Auleta Decl. ¶ 12). Other documents submitted by plaintiff, however, indicate that Dr. Sharma's primary issue with plaintiff was not his disability, but his frequent submission of lengthy grievances which the medical staff believed had already been addressed. (*See, e.g.*, Pl.'s Ex. 515). In any event, inmate Auleta's one subjective observation, about a doctor who was only minimally involved in plaintiff's care, would not create an issue of fact regarding the claimed discriminatory animus on the part of the DOCS staff.

For similar reasons, the court concludes that no DOCS officials acted with "deliberate indifference" to plaintiff's need for outdoor exercise, so that he would have no basis for the Eighth Amendment claim to which he alludes in his papers. (Pl.'s Mem. of Law at 35-36). *See*

## VII.   Retaliation

The Amended Complaint alleges that, on November 19, 2009,[46] defendants Vogel and Houle approached plaintiff after meal time, directed plaintiff to a private room, and threatened to "give the plaintiff a very difficult time when he goes to the mess hall" unless he dropped the instant suit against "their buddies," defendants Malloni and Meachum.  (AC ¶ 59).  Plaintiff further claims that defendants Vogel and Houle thereafter issued a false misbehavior report against him, which resulted in a thirty day loss of recreation.  (*Id.*).

The Amended Complaint further alleges that, on December 26, 2009,[47] defendant Fabrizio "confronted" plaintiff about the instant lawsuit against defendant Malloni, and told him that "Italians stick together."  (AC ¶ 60).  Plaintiff claims that proposed defendant Fabrizio "then filed a bogus misbehavior report" against him, initially resulting in a sanction of six months keeplock.  (*Id.*)

The court concludes that these allegations of retaliation cannot survive summary judgment.  With respect to the first disciplinary action taken against plaintiff, the sanction imposed was minor and not the type of "adverse action" required to establish a First Amendment violation.  With respect to both disciplinary

---

9/28/09 Memorandum-Decision and Order of Chief Judge Mordue at 17-19 (Dkt. No. 49) (dismissing any suggested Eighth Amendment claim relating to "community coats" and alleged deprivation of outdoor exercise).

[46] The date of the incident in the Amended Complaint is November 19, 2010, but the year is clearly a clerical error, because plaintiff first made this allegation well before November 2010.

[47] Plaintiff made the same error with respect to the year in his allegation relating to defendant Fabrizio on December 26.  (Dkt. No. 49 at 5 & n.4).

actions, no reasonable jury could conclude that plaintiff did not commit the most serious misconduct charged; because there were proper, non-retaliatory reasons for both misbehavior reports, plaintiff's claims of retaliation should be dismissed.

### A.     Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).  However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff were entitled to, and did receive, full procedural due process. *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988).  Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary

firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted).  Accordingly, plaintiff must set forth non-conclusory allegations.  *Id.*  Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.  *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

### B.    Application

Defendants appear to concede, for the purposes of the motion, that there is at least a material issue of fact that plaintiff engaged in protected conduct, by filing this lawsuit, and that the named defendants harbored some retaliatory intent.[48]  The defense argues primarily that plaintiff's retaliation claims cannot survive summary judgment because there is no dispute that he would have been properly disciplined for the conduct in question regardless of whether he filed this action.

### 1.    Defendants Vogel and Houle

On November 20, 2009, C.O. Vogel, the officer in charge of the Walsh mess

---

[48] All three named defendants have denied knowing about plaintiff's lawsuit at the time they initiated disciplinary charges against him, and/or making any of the alleged statements threatening plaintiff if he failed to drop the suit.  (Houle Decl. ¶¶ 11-12, Dkt. No. 107-14; 11/25/09 Houle Mem., Dkt. No. 124-10 at 17; Vogel Decl. ¶¶ 13-14, Dkt. No. 107-17; 3/25/10 Fabrizio Mem., Dkt. No. 124-11 at 8).

hall at Mohawk, filed an Inmate Misbehavior Report against plaintiff, which was

endorsed by Head Cook Houle. (Dkt. No. 107-20 at 5). According to the report,

defendant Houle informed C.O. Vogel that plaintiff had, on several prior occasions,

had been caught "taking" food from the tray of another inmate, who will be referred to

as "J," the first initial of his last name. As a result of these incidents, plaintiff was

given verbal warnings, and inmate J, who had some mental limitations, was moved to

another table. (*Id.*). Defendant Vogel reported that, when plaintiff arrived for "chow"

on November 19th, he went directly to the table of inmate J, instead of to plaintiff's

regular seat. C.O. Vogel reportedly gave plaintiff a direct order to move to his regular

seat. Plaintiff refused to comply with the direct order and became "loud and

boisterous," which incited other inmates to shout, and caused a disruption in the mess

hall. Plaintiff refused several more direct orders to move before he eventually went to

his regular seat. Plaintiff then persisted in yelling and swearing at defendant Houle,

despite C.O. Vogel's orders to stop. (*Id.*).

In the misbehavior report, C.O. Vogel charged plaintiff with refusing direct

orders, creating a disturbance, verbal harassment, verbal obstruction, and lying. (*Id.*).

On November 23, 2009, Lt. Judway conducted a Tier II disciplinary hearing. (Dkt.

No. 138-1). At the conclusion of the hearing Lt. Judway found plaintiff guilty of

creating a disturbance, harassment, and refusing a direct order. The hearing officer

found plaintiff not guilty of interference with an employee and false statements. (Dkt.

No. 107-20 at 2). Lt. Judway sentenced plaintiff to a 30-day loss of recreation

privileges. Given the minor nature of the sanction imposed, the disciplinary charges

did not constitute an "adverse action" that would support a claim of retaliation.  *See, e.g., Bartley v. Collins*, 95 Civ. 10161, 2006 WL 1289256 at *7 (S.D.N.Y. May 10, 2006) (misbehavior reports which resulted in loss of privileges, but not significant time in keeplock, were *de minimis* and did not constitute adverse action); *Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184,  at *14 (N.D.N.Y. March 15, 2010) (plaintiff's "full bed" restriction for one day and minor privilege restrictions are more akin to the *de minimis* deprivations that have not been found to constitute adverse action); *Shaheen v. McIntyre*, 9:05-CV-0173 (TJM/GHL), 2007 WL 3274835, at *9 & n.76 (N.D.N.Y. Nov. 5, 2007).

If there is no dispute that plaintiff, in fact, committed the most serious of the prohibited conduct charged in the misbehavior report, "even assuming retaliatory motive, [Defendants would be] entitled to summary judgment '[because] there were proper, non-retaliatory reasons for [Plaintiff's] punishment.'"  *Carl v. Griffin*, 08 Civ. 4981, 2011 WL 723553, at *6 (S.D.N.Y. Mar. 2, 2011) (quoting  *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (recognizing a presumption that a prison official's acts to maintain order are done for a proper purpose).  *See also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because "it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct" for which he had been cited in a misbehavior report)).

Plaintiff pled "not guilty" to all of the charges against him (Dkt. No. 107-20 at 4), and artfully referred to them in the Amended Complaint as "bogus and/or

frivolous." (AC ¶ 59). Plaintiff's various accounts of the incident on November 19, 2009, minimize his conduct, and are highly critical of the charges and the defendants who lodged them. However, plaintiff's factual statements do not rebut, and are not inconsistent with Lt. Judways's findings that plaintiff refused C.O. Vogel's initial orders to move to another table in the mess hall, or that, by his verbal response to defendants Vogel and Houle, plaintiff created a disturbance. (11/23/09 Disc. Hearing Tr. at 3;[49] Dkt. No. 124-10 at 3, 5, 7-8, 10-13 (Pl.'s 11/19/09 Grievance); Pl.'s Mem. of Law at 43-44; Pl.'s Stmt. of Mat. Facts at 38-40).

For example, plaintiff has repeatedly argued that he was never involved in "stealing" food from other inmates, and tries to suggest that defendant Houle falsely accused him of that. (*See, e.g.*, Dkt. No. 124-10 at 2-3, 5; Pl.'s Stmt. of Mat. Facts at 38-40). In fact, the misbehavior report speaks of defendant Houle's report of plaintiff "taking," not "stealing," food from the trays of other inmates. (Dkt. No. 107-20 at 5; Dkt. No. 124-10 at 17). Moreover, the responses to plaintiff's grievance about the incident makes clear that, even if plaintiff was merely "swapping" or "sharing" food, such conduct was clearly prohibited by mess hall rules and inconsistent with plaintiff's restricted diet, and justified separating him from inmate J in the mess hall.

---

[49] At the disciplinary hearing, the plaintiff had the opportunity to be heard, but offered no pertinent testimony to contest the charges in the misbehavior report for which he was found guilty. Instead, he argued that there were no assigned seats in the mess hall and, if he was "trying to start a riot or something," he should have been immediately removed from the mess hall. Plaintiff also complained about being charged because he believed he had informally resolved the matter by speaking to the Deputy Superintendent for Administration. (11/23/09 Disc. Hearing Tr. at 2-3).

(Dkt. No. 124-10 at 3-4, 18-20).[50]  In any event, while plaintiff repeatedly tried to lead his audience on such irrelevant factual detours, he never addressed or denied the allegations that he disobeyed a direct order of C.O. Vogel to move to another table, or reacted verbally in such a hostile way as to create a disturbance in the mess hall.

Plaintiff was found guilty of the most serious disciplinary charges against him,[51] based on the inmate misbehavior report and his failure to offer any factual defense. (11/23/09 Disc. Hearing Tr. at 3).  Accordingly, defendants have established there was a proper, non-retaliatory reason for the initiation of the misbehavior report by defendants Houle and Vogel, and they are entitled to summary judgment on this claim. *See, e.g., Hynes v. Squillace*, 143 F.3d at 657 (the record demonstrates that plaintiff in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, and thus the defendants met their burden of demonstrating non-retaliatory reasons for filing the misbehavior report); *Fullwood v. Vosper*, 9:99-CV-1586 (LES), 2007 WL 119456, at *4 (N.D.N.Y. Jan. 9, 2007) (whether plaintiff committed the prohibited conduct was not seriously in dispute because, while plaintiff denied the charges, his deposition testimony and the Tier II hearing transcript

---

[50] Inmate J did not accuse plaintiff of taking food from him, but did say he shared bread with the plaintiff.  (Dkt. No. 124-10 at 19-20).  Plaintiff denied even sharing bread with inmate J, but admitted he occasionally "would carry bread back 'for' [Inmate J], due to his health condition."  (Pl.'s Stmt. of Mat. Facts at 40).  Although this factual detail is clearly not material, it seems doubtful that a paraplegic, who presumably required both hands to propel his wheelchair, would carry bread for an inmate with mental handicaps.

[51] See, e.g., *Hynes v. Squillace*, 143 F.3d at 655, 657 (for the purposes of evaluating a claim of retaliation for initiating misbehavior reports, a charge of disobeying a direct order was the most serious of the disciplinary charges, which also included charges of threats, which was found to be "arguably as serious"; verbal harassment; and creating a disturbance).

contradicted those denials); *Carl v. Griffin*, 2011 WL 723553, at *6.

### 2.   Defendant Fabrizio

On December 26, 2009, C.O. Fabrizio issued an inmate misbehavior report against plaintiff, charging him with creating a disturbance, refusing a direct order, verbal harassment, being out of place, making threats, and causing a delay of the inmate count. (Dkt. No. 107-21 at 10).  That morning, security officers were conducting an inmate count in the A-wing, during which inmates were required to remain in their rooms.  However, plaintiff had rolled his wheelchair into the hallway, where he may have been conversing with another inmate located in a nearby room.  Defendant Fabrizio ordered plaintiff to return to his room until the count was completed.  Plaintiff  reportedly responded by shouting words to the effect of:  "I'm busy.  Mind your own business."  The officer told plaintiff, at least once more, to return to his cell, but plaintiff increased his verbal abuse, yelling vulgarities.  Plaintiff was allowed to go to the mess hall for lunch.  When he returned to the A-wing, plaintiff resumed his verbal outbursts, calling C.O. Fabrizio "bitch," and threatening to "put him on paper."  C.O. Fabrizio advised Sgt. Lawrence of this continuing misconduct, and the sergeant directed that plaintiff be moved to a "keeplock" room.  When C.O. Fabrizio ordered plaintiff to come with him to the other room, plaintiff refused, yelling more foul language, saying, among other things, "If you try to move me, I'll bitch slap you."  (*Id*.).

On January 8, 2010, a Tier III hearing was conducted, and plaintiff was found guilty of all the disciplinary charges except delaying the inmate count, and sentenced

to six months in keeplock.  (Dkt. No. 137-1 at 31-32).[52]  However, over plaintiff's

objection, the hearing officer declined to call one of three nurse assistants who had

endorsed the misbehavior report, believing that her testimony would have been

duplicative.  (Dkt. No. 137-1 at 22-23; Dkt. No. 107-23 at 3).  Plaintiff filed an Article

78 Petition in Oneida County.  On November 8, 2010, the state Supreme Court found

that, under DOCS regulations, plaintiff should have been allowed to examine all of the

endorsing witnesses, and remanded the matter for a rehearing.  (11/23/10

Decision/Order, Dkt. No. 107-23).

On November 30, 2010, Capt. St. Louis commenced a new hearing, which

concluded on December 9, 2010.  Plaintiff initially requested several witnesses

(including the nurse assistant who had been the subject of the Article 78 proceeding),

but subsequently withdrew those requests.  (12/9/2010 Disc. Hearing Tr., Dkt. No.

140-1 at 3-4, 5-6, 13-14; Dkt. No. 107-21 at 3).  Plaintiff was found guilty of four

charges, including refusing a direct order, found not guilty of making threats and

delaying the count, and sentenced to "counsel and reprimand."  (Dkt. No. 140-1 at 14;

Dkt. No. 107-21 at 1).

Defendants have assumed, for the purposes of this motion, that plaintiff's

expunged sentence of six months in keeplock constituted an "adverse action" which

could support a retaliation claim, and this court will do so as well.  However, no

reasonable jury could conclude that plaintiff did not commit the most serious of the

---

[52] "Keeplock" is a form of disciplinary confinement where the inmate is confined to his own cell for the duration of the disciplinary sanction. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989).

prohibited conduct charged in the misbehavior report–the failure to obey defendant Fabrizio's direct orders.   (*See* note 51, above).  Accordingly, based on the authority cited above, defendants are entitled to summary judgment because, even assuming C.O. Fabrizio had a retaliatory motive, it has been established that there were proper, non-retaliatory reasons for charging plaintiff with misconduct.

Plaintiff pled not guilty to the disciplinary charges (Dkt. No. 137-1 at 4; Dkt. No. 140-1 at 6) and has characterized defendant Fabrizio's misbehavior report as "bogus" (AC ¶ 60) and "fabricated" (Pl.'s Mem. of Law 41).  However, while plaintiff again has made various statements criticizing the disciplinary charges and the officer who filed them, he made numerous admissions regarding the most serious charges at two disciplinary hearings, which persuaded two different hearing officers to find plaintiff guilty of disobeying a direct order, being out of place, creating a disturbance, and verbal harassment.

At the first disciplinary hearing, plaintiff denied that he came out of his cell before the count was cleared.  (1/8/2010 Disc. Hearing Tr., Dkt. No. 137-1 at 6, 12, 19).  However, plaintiff acknowledges that, when C.O. Fabrizio ordered him to return to his cell, plaintiff "had a few words with the officer" and told him to "mind your business." (Dkt. No. 137-1 at 6, 12-13, 21-22).  Plaintiff also admits refusing C.O. Fabrizio's orders to move to a keeplock room, purportedly because the plaintiff did not realize that the officer had received authorization from a sergeant to move plaintiff.  (Dkt. No. 137-1 at 17-18, 25).  While plaintiff did not admit making several specific vulgar or threatening statements attributed to him, he acknowledged that "he

had words" with C.O. Fabrizio relating to his order to move to a keeplock room.  (Dkt. No. 137-1 at 21).

At the second disciplinary hearing, plaintiff testified that he came out of his room after hearing the count clear "over the radio" by which the guards communicate; but plaintiff admitted that he did not know whether the Corrections Officer on the unit had advised the inmates that the count had been cleared, which was required before anyone could leave his cell.  (12/9/2010 Disc. Hearing Tr., Dkt. No. 140-1 at 7-8, 14; Dkt. No. 107-21 at 2; Pl.'s Stmt. of Mat. Facts at 43).  Further, plaintiff did not deny that he screamed and yelled, and made some of the vulgar statements described in C.O. Fabrizio's report; rather, he claimed that the angry words had been directed toward another inmate with whom he was having an argument.  Plaintiff did acknowledge telling C.O. Fabrizio to mind his business and threatening to sue the Corrections Officer.  (12/9/2010 Disc. Hearing Tr., Dkt. No. 140-1 at 8-11; Dkt. No. 107-21 at 2; Pl.'s Stmt. of Mat. Facts at 43).[53]

Three different nursing assistants were witnesses to some or all of plaintiff's misconduct, including Phyllis McDougall, who filed a declaration in support of defendants' summary motion.  (Dkt. No. 107-15).  In his papers opposing the pending motion, plaintiff makes a great deal of alleged inconsistencies between Ms. McDougall's declaration and her brief testimony at the first disciplinary hearing, where she acknowledged witnessing "some" of the events in question.  (Pl.'s Mem. of

---

[53] During the prior disciplinary hearing, plaintiff denied telling C.O. Fabrizio that he was going to sue the Corrections Officer.  (Compare 12/9/2010 Disc. Hearing Tr., Dkt. No. 140-1 at 9 with 1/8/2010 Disc. Hearing Tr., Dkt. No. 137-1 at 8, 21).

Law at 41-42; Pl.'s Stmt. of Mat. Facts at 40-41; Dkt. No. 137-1 at 27).  While the transcript reflects certain inaudible portions, Ms. McDougall testified that she heard the Corrections Officer direct plaintiff to go his room for the count, and that the plaintiff replied he was "busy doing something." (Dkt. No. 137-1 at 27).  Plaintiff argues that the details in Ms. McDougall's declaration about defendant's vulgar responses to the officer during the count go beyond her testimony at the first hearing.  But, plaintiff did not ask Ms. McDougall for more details during the hearing, and the another witness testified immediately after McDougall that plaintiff used "a dirty name" in responding to the Corrections Officer.  (*Id.* at 27, 29).  Plaintiff's weak efforts to attack the credibility of the witnesses to his misconduct highlights the absence of any direct factual refutation of the primary charges against him.

In short, there is no real dispute that the disciplinary action taken against plaintiff for disobeying a direct order and other misconduct on December 26, 2009, was factually justified.  Accordingly, C.O. Fabrizio is entitled to summary judgment on plaintiff's retaliation claim.  *See, e.g., Hynes v. Squillace*, 143 F.3d at 657; *Fullwood v. Vosper*, 2007 WL 119456, at *4; *Carl v. Griffin*, 2011 WL 723553, at *6.

## V.    Qualified Immunity

Defendants have asserted that they are entitled to qualified immunity in connection with some or all of plaintiff's claims.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that,

"while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory" in all cases).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights.

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, that defendants' motion for summary judgment under Fed. R. Civ. P. 54 (Dkt. No. 107) be  **GRANTED** and the Amended Complaint (Dkt. No. 85) **DISMISSED**, in its entirety.

      Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Date:  September 9, 2011

Hon. Andrew T. Baxter
U.S.  Magistrate Judge